THOMAS P. O'BRIEN
United States Attorney
SHERI PYM
Assistant United States Attorney
Chief, Riverside Branch Office
DOROTHY R. MCLAUGHLIN (Cal. Bar No. 229453)
Assistant United States Attorney
        3880 Lemon Street, Suite 210
        Riverside, California 92501
        Telephone: (951) 276-6222
        Facsimile: (951) 276-6944
        E-Mail: dorothy.mclaughlin@usdoj.gov

Attorneys for Plaintiff
United States of America



UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

ED 08-312 M

ED CR Misc. No. 08-____

IN RE: THE PALM SPRINGS
BAKING COMPANY AND
JUST OFF MELROSE, INC.

ORDER FOR DESIGNATING AND
DETAINING MATERIAL WITNESSES
WITH APPEARANCE BONDS WITH
THIRD PARTY AFFIDAVITS OF
SURETY THEREON

        FOR GOOD CAUSE SHOWN and pursuant to Title 18, United States

Code, Section 3144:

        IT IS HEREBY ORDERED AND DECREED that the following

individuals are hereby declared to be material witnesses in the

above-captioned investigation, and shall be bound over to the

custody of the United States Marshal, Central District of

California, or in the alternative, each released on the

furnishing of a $5,000 appearance bond (with approval of the

//

//

//

1  surety by Pre-trial Services), as well as Pre-trial Services'

2  supervision to assure their presence at trial:

3      1.   Mariano Benitez-Gutierrez

4      2.   Julio Crespin-Perez

5      3.   Melvin Rodriguez-Segura

8      DATED:  This _____ day of October, 2008.

10     _____
       THE HONORABLE OSWALD PARADA
11     UNITED STATES MAGISTRATE JUDGE

12  Presented by:

15  _____
    DOROTHY R. MCLAUGHLIN
16  Assistant United States Attorney

                        2

## AFFIDAVIT

I, Larry Chacon, being duly sworn, hereby depose and state:

      1.     I am a Special Agent ("SA") of the Immigration and Customs Enforcement, Department of Homeland Security ("ICE") and have been so employed since March 1, 2003. Prior to my employment by ICE, I was a Special Agent for the Immigration and Naturalization Service ("INS") since April 1996. My responsibilities include the investigation of work sites for criminal or administrative violations.

      2.     This affidavit is made in support of the government's motion to designate and detain the following individuals as a material witnesses in this matter: Mariano Benitez-Gutierrez; Julio Crespin-Perez, and Melvin Rodriguez-Segura. The government is moving to designate and detain these individuals as material witnesses in connection with an investigation concerning the Palm Springs Baking Company and Just Off Melrose, Inc. and possible violations of Title 8, United States Code, Section 1324 (Harboring Illegal Aliens).

      3.     The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from other law enforcement officers and witnesses. This affidavit is intended to support the designation of material witnesses and does not purport to set forth all of my knowledge of the investigation into this matter.

      4.     As used in this affidavit, the term "alien" is defined as a person who is not a natural-born or naturalized citizen, or national, of the United States.

      5.     On or about June 19, 2006, I reviewed a copy of a memorandum sent from United States Border Patrol ("USBP") Agent Alicia M. Ramirez to ICE Acting Assistant Agent in Charge ("AASAC"), Dora Luz Ancona. From reviewing that memorandum, I learned the

following:

    a.    On June 8, 2006, USBP Agent Alicia M. Ramirez, Indio Station, notified ICE, Office of the Assistant Special Agent in Charge, Riverside-San Bernardino (ASAC/RV-SB), AASAC Ancona concerning the employment of possible undocumented aliens at the Palm Springs Bakery Company ("PSBC"), located at 1196 Montalvo Way, Palm Springs, California 92262-5441 ("PSBC").  Palm Desert Police Department Captain Craig Kilday conveyed this information to USBP Patrol Agent in Charge Michael Singh, Indio, California.  According to Captain Kilday, the owner of the PSBC guarantees employment to illegal aliens for a payment of approximately $3,000.  Captain Kilday stated that the company employs as many as 17 illegal aliens.

### DOCUMENTARY EVIDENCE

<u>Palm Springs Baking Company</u>

    6.    I submitted an administrative subpoena to the California Employment Development Department ("EDD") on October 27, 2007 for the PSBC's most recent Quarterly Wage and Earning Reports.  Quarterly Wage and Earning Reports show an employee's name and social security number ("SSN").  I received EDD Quarterly Wage and Earning Statements on November 1, 2007.

    7.    I have reviewed certified copies of the PSBC's EDD reports and discovered that the PSBC had reported approximately 133 employees' names and SSN's to the EDD for the 3rd quarter of 2006, through the 2nd quarter of 2007.

-2-

8.      In 2007, I submitted the approximately 133 names and SSN's, which I obtained from the EDD reports, to the Social Security Administration ("SSA") in Fontana, California. An SSA service representative researched the names and SSN's and discovered that approximately 106 of the names and SSN's were invalid, meaning that the names and social security numbers did not match in the Social Security Administration's records.

9.      Based upon this information, I conducted an additional investigation. I ran all one hundred and six names through the Department of Homeland Security ("DHS") immigration computer indices. The DHS immigration computer indices track and document each time an alien is encountered in the United States by DHS or is granted permission to legally enter the United States. I was unable to locate any legal record for any of the above-mentioned 106 names ever applying for admission to enter or having been encountered by DHS, or receiving permission from the Attorney General of the United States to legally enter the United States. Based on my training and experience, I know that such documentation is required to legally enter the United States and if such documentation existed, it would be filed and recorded with the Department of Homeland Security.

10.     I have reviewed a report from TransUnion Credit and Fraud Bureau for the SSN's annotated in the EDD reports and discovered that approximately 68 of the 133 SSN's were assigned to deceased persons (5), as well as United States citizens/residents from California, Nevada, Mississippi, Iowa, New York, Utah, New England, Nebraska, Pennsylvania, and Colorado. Furthermore, I discovered that approximately twenty-five individuals appeared to be earning wages without a valid SSN; in other words, these twenty-five individuals appeared to be using social security numbers that were essentially made up numbers for which the Social

-3-

Security Administration had no record at all.

Just Off Melrose, Inc.

11.     Just Off Melrose, Inc. ("JOM")  is, like Palm Springs Baking Company, a business that makes bread.  JOM is located in the same building as PSBC, and thus also located at 1196 Montalvo Way, Palm Springs, California 92262-5441.  I know this from interviews with a witness in this investigation.  See infra.

12.     On July 17, 2008, I received from the  EDD the most recent Quarterly Wage and Earning Reports for Just Off Melrose, Inc. ("JOM") .

13.     On July 17, 2008, SA Dorado and I reviewed certified copies of the JOM EDD reports and found that the JOM had reported approximately 117 employees and social security numbers to the EDD for 1st Quarter 2000 to 4th Quarter 2007.

14.     On July 18, 2008, I submitted the approximately 117 names and social security numbers, which I obtained from the EDD reports, to the SSA in Fontana, California.  A SSA service representative researched the names and SSN's.  The representative discovered that approximately 97 of the names and social security numbers were invalid, meaning that the names and social security numbers did not match in the Social Security Administration's records.  The SSA representative reported that information to me.

15.     Based upon this information, I conducted an additional investigation.  I ran all ninety-seven names that the Social Security Administration representative found to have invalid social security numbers through the Department of Homeland Security ("DHS") immigration computer indices.  From my training and experience, I know that the DHS immigration computer indices track and document each time an alien is encountered in the United States by DHS or is

-4-

granted permission to legally enter the United States. I was unable to locate any legal record for

any of the ninety-seven names ever applying for admission to enter or having been encountered

by DHS, or receiving permission from the Attorney General of the United States to legally enter

the United States. Based on my training and experience, I know that such documentation is

required to legally enter the United States and if such documentation existed, it would be filed

and recorded with the Department of Homeland Security.

## PRE-SEARCH WITNESS INTERVIEWS

16.   On December 17, 2007, I conducted surveillance of PSBC with SAs Eric Blair,

Manuel Dorado, Corbin Maxwell, and Palm Springs Police Department Officer Melanson. We

watched a vehicle leave the PSBC. Officer Melanson conducted a traffic stop on the vehicle.

Officer Melanson interviewed and identified the three occupants in the vehicle. The PSPD officer

suspected that the individuals were Mexican nationals and requested assistance from ICE SAs

Eric Blair, Corbin Maxwell, and I to determine the immigration status these individuals.

17.   I interviewed the three individuals stopped in a car driving away from the PSBC

and will refer to them as Witness #1, the driver of the vehicle, Witness #2, and Witness #3. Each

of the three individuals claimed to be a native and citizen of Mexico and to be present in the

United States illegally.

18.   On December 17, 2007, SA Blair and I interviewed Witness #1. Witness #1

stated that she/he is a citizen and native of Mexico, having entered the United States illegally.

Witness #1 stated that on December 17, 2007, at approximately 10:50 a.m., she/he went to pick

up her/his sibling, Witness #2, and her/his friend at the PSBC.

19.   On December 17, 2007, SA Manuel Dorado and I interviewed PSBC employee

-5-

Witness #2. From that interview, I learned the following:

    a.   Witness #2 stated that she/he is a citizen and native of Mexico, having entered the United States illegally.

    b.   Witness #2 stated that she/he began her/his employment with the PSBC on October 27, 2000, and that a previous employee Eduardo CARMONA assisted her/him in obtaining the job by talking to the floor supervisor William "Willie" NELSON. Witness #2 stated that NELSON gave authorization to hire her/him after reviewing the application while CARMONA was present. Witness #2 also said that the overall service supervisor is William NELSON.

    c.   Witness #2 stated that she/he did not fill out a Form I-9 or a Form W-4 when she/he was hired. Witness #2 stated that her/his immediate supervisors at the PSBC are Alicia RAMIREZ and Margarita HERNANDEZ.

    d.   Witness #2 stated that she/he purchased a fraudulent social security card in Arizona.

    20.   On or about January 2, 2008, SA Naranjo provided me with a photographic lineup that included a photograph of William Glenn Nelson, Jr. ("NELSON"). Based on my training and experience, I know that SA Naranjo put together this photographic lineup by searching California Department of Motor Vehicles records for NELSON, printing out his photograph and placing the photograph into a "six pack" with other similar photographs. This six pack was shown to the Witnesses, as described *infra,* and they identified NELSON. I have seen the DMV

photograph of NELSON and the six pack in which he appears.

21.     On or about January 2, 2008, SA Naranjo provided me with a photographic lineup that included a photograph of Alicia Ramirez ("RAMIREZ"). Based on my training and experience, I know that SA Naranjo put together this photographic lineup by searching California Department of Motor Vehicles records for RAMIREZ, printing out her photograph and placing the photograph into a "six pack" with other similar photographs. This six pack was shown to Witnesses, as described *infra* and they identified RAMIREZ. I have seen the DMV photograph of RAMIREZ and the six-pack in which she appears.

22.     On or about January 2, 2008, SA Naranjo provided me with a photographic lineup that included a photograph of Margarita Avilez Hernandez ("HERNANDEZ"). Based on my training and experience, I know that SA Naranjo put together this photographic lineup by searching California Department of Motor Vehicles records for HERNANDEZ, printing out her photograph and placing the photograph into a "six pack" with other similar photographs. This six pack was shown to Witnesses, as described *infra* and they identified HERNANDEZ. I have seen the DMV photograph of HERNANDEZ and the six-pack in which she appears.

23.     On or about May 9, 2008, SA Blair provided me with a photographic lineup that included a photograph of Eduardo Carmona ("CARMONA"). Based on my training and experience, I know that SA Blair put together this photographic lineup by searching California Department of Motor Vehicles records for CARMONA, printing out his photograph and placing the photograph into a "six pack" with other similar photographs. This six pack was shown to Witnesses, as described *infra* and they identified CARMONA. I have seen the DMV photograph of CARMONA and the six-pack in which he appears.

24.     On December 17, 2007, SA Manuel Dorado and I interviewed Witness #3. Witness #3 stated that she/he is a citizen and native of Mexico, having entered the United States illegally. Witness #3 stated that Floor Supervisor William "Willie" NELSON hired her/him to work at the PSBC. Witness #3 said that she started work at PSBC on January 1, 2005. Witness #3 stated that she/he entered a fraudulent SSN on the application and has never completed an I-9 form. Witness #3 stated that her/his immediate supervisor was RAMIREZ and that she/he (Witness #3 ) has engaged in conversations with other employees of the PSBC whom she/he believed to be illegal aliens. The conversations regarded employee medical insurance and Witness #3's fear of becoming ill or injured because she/he believed that management would terminate her/his employment.

25.     On December 18, 2007, SAs Michael Naranjo and Manuel Dorado interviewed Witness #2. SA Dorado provided me with a written report of this interview. From reviewing this report, I learned that Witness #2 stated the following:

> a.     That she/he illegally entered the United States in September of 2000, at the Mexico/Arizona border, paying an alien smuggler $1,500.00 to be smuggled into the United States. Witness #2 stated that a friend referred her/him to the PSBC and that she/he (Witness #2 ) went to the PSBC and completed an application for employment. Witness #2 submitted the application the following day. Witness #2 stated that she/he received a telephone call from CARMONA asking her/him to bring her/his social security card to the PSBC. Witness #2 provided CARMONA and NELSON with a fraudulent social security card and that CARMONA and

-8-

NELSON made a copy of the fraudulent SSC. Witness #2 stated
CARMONA offered her/him employment at the PSBC starting the
following day.

b.   SA Naranjo showed Witness #2 a blank I-9 form. Witness #2 stated that
she/he had never seen an I-9 form.

c.   Witness #2 stated that after working for several months at the PSBC,
she/he told her/his immediate supervisor, RAMIREZ, that she/he (Witness
#2 ) was in the United States illegally. Witness #2 stated that she/he also
told HERNANDEZ that she/he (Witness #2) was in the United States
illegally. Witness #2 stated that she/he believes there are approximately
30 undocumented aliens employed at the PSBC.

26.   On December 18, 2007, SA Angel Carvajal and I interviewed Witness #3.
Witness #3 stated that she/he paid an alien smuggler $3,000 to be smuggled into the United
States. Witness #3 stated that she/he resided with a PSBC employee named A. Witness #3
stated that A told Margarita HERNANDEZ, Supervisor, about employing Witness #3 at the
PSBC. Witness #3 stated that she/he met with HERNANDEZ and was told to return in eight
days. Witness #3 stated that when she/he returned to the PSBC, she/he met with HERNANDEZ
and NELSON for an interview and completed an application for employment. Witness #3 stated
that she/he entered a fraudulent SSN on her/his application for employment with the PSBC.
Witness #3 stated that she/he never told HERNANDEZ and NELSON about the fraudulent SSN.

27.   I then showed Witness #3 a blank Form I-9 and Form W-4. Witness #3 stated that
she/he has never seen or completed an I-9 form. Witness #3 stated NELSON had her/him

-9-

complete a Form W-4 approximately one year after her/his hiring date at the PSBC. Witness #3 stated that NELSON directs and supervises HERNANDEZ, RAMIREZ, and the other company employees. Witness #3 stated that NELSON, HERNANDEZ, and RAMIREZ do not allow the employees to interact with each other and do not provide employee medical insurance. Witness #3 stated that she/he believes the other employees at the PSBC are Mexican nationals and are in the United States illegally.

28.     On January 3, 2008, SA Manuel Dorado and I met with Witness #2. I showed Witness #2 a photographic lineup display folder marked, "I" containing six photographs numbered one through six. Witness #2 identified the photograph in position number "3" as NELSON. Witness #2 stated that NELSON is a manager with PSBC. The photograph in position 3 of lineup I is in fact NELSON.

29.     On January 3, 2008, SA Agent Manuel Dorado and I showed Witness #2 a photographic lineup display folder marked, "K" containing six photographs numbered one through six. Witness #2 identified the photograph in position number "5" as RAMIREZ. Witness #2 stated that RAMIREZ is her immediate supervisor at the PSBC. The photograph in position 5 of lineup K is in fact RAMIREZ.

30.     On January 3, 2008, SA Manuel Dorado and I showed Witness #2 a photographic lineup display folder marked, "J" containing six photographs numbered one through six. Witness #2 identified the photograph in position number "4" as HERNANDEZ. Witness #2 stated that HERNANDEZ is her/his immediate supervisor at the PSBC. The photograph in position 4 of lineup J is in fact HERNANDEZ.

31.     On January 3, 2008, SA Agent Manuel Dorado and I showed Witness #3 a

-10-

photographic lineup display folder marked, "I" containing six photographs numbered one through six. Witness #3 identified the photograph in position number "3" as NELSON. Witness #3 stated that NELSON is her manager at the PSBC.

32.     On January 3, 2008, SA Manuel Dorado and I showed Witness #3 a photographic lineup display folder marked, "K" containing six photographs numbered one through six. Witness #3 identified the photograph in position number "5" as RAMIREZ. Witness #3 stated that RAMIREZ is her/his immediate supervisor at the PSBC.

33.     On January 3, 2008, SA Manuel Dorado and I showed Witness #3 a photographic lineup display folder marked, "J" containing six photographs numbered one through six. Witness #3 identified the photograph in position number "4" as HERNANDEZ. Witness #3 stated that HERNANDEZ is her/his immediate Supervisor at the PSBC.

34.     On January 14, 2008, SA Michael Naranjo, Manuel Dorado, and I interviewed Witness #3 . Witness #3 stated that RAMIREZ approached her/him approximately ten days after she/he (Witness #3) started employment at the PSBC to ask Witness #3 how she/he had entered the United States. Witness #3 stated that she/he told RAMIREZ she/he had paid a smuggler $3,000, that she/he entered the United States illegally, and had no legal documents. Witness #3 also stated that management did not approach her/him again about this matter.

35.     On January 17, 2008, SA Angel Carvajal and I interviewed Witness #2. Witness #2 stated that RAMIREZ approached her/him approximately four months after RAMIREZ became a supervisor and started a conversation concerning how she/he (Witness #2) had entered the United States. Witness #2 stated that she/he told RAMIREZ she/he had been smuggled into the United States illegally. Witness #2 also stated that on several occasions she/he told

-11-

supervisors RAMIREZ and HERNANDEZ that she/he was undocumented and illegal.

36.     On March 18, 2008, at approximately 4:45 p.m., SA's Preston Ober and Manuel

Dorado observed a Hispanic individual depart the PSBC wearing what appeared to be a white

uniform. The individual entered a vehicle that departed the PSBC, stopping at a residential

address. SA's Dorado, Ober, Stephen Marin, and I approached the driver of the vehicle (Whom I

reference here as Witness #4).  Witness #4 stated that she/he is a citizen and native of Mexico,

having entered the United States illegally.

37.     On March 18, 2008, Special Agent Manuel Dorado, Stephen Marin, and I

interviewed Witness #4.  Witness #4 stated she/he was born in Mexico; and that in June of 2000,

she/he paid a smuggler $1,500 to be smuggled into the United States.  Witness #4 stated that a

relative made arrangements with PSBC supervisor CARMONA to obtain employment for her/his

(Witness #4 ) at the PSBC.  CARMONA provided Witness #4's relative a PSBC application,

which Witness #4 completed in August of 2002.  Witness #4 stated that a relative provided

her/him (Witness #4 ) with a fraudulent social security number.  Witness #4 entered this SSN on

the application.  Witness #4 stated that CARMONA telephoned and informed her/him (Witness

#4 ) that she/he was now employed at the PSBC.  Witness #4 stated that she/he began her/his

employment at the PSBC on November 5, 2002.

38.     Witness #4 stated that her/his immediate supervisor is HERNANDEZ and the

overall service supervisor is NELSON.  Witness #4 stated that "David" is the name of the owner

of the PSBC. Witness #4 stated that she/he approached her/his supervisor, HERNANDEZ, and

requested March 18, 2008, off from work because her/his child was ill and that she/he (Witness

#4 ) needed to take her/his child to a doctor.  Witness #4 stated that HERNANDEZ appeared

-12-

upset and made what she/he considered a derogatory statement: "You wetbacks are always trying to get off and take advantage of the welfare system; if you keep this up, I am going to notify Immigration myself."

39.     Witness #4 stated that she/he had been injured on the job and notified HERNANDEZ concerning the injury.  HERNANDEZ then told NELSON about the injury. Witness #4 stated that HERNANDEZ told her/him that "Willie" (NELSON) said not to seek medical assistance because she/he may lose her job. Witness #4 stated that if she/he missed work because of the injury she/he could lose her/his job.  She/he returned to work injured and was given light duty.

40.     On March 18, 2008, I showed Witness #4 a blank Form I-9 and asked if she/he had ever seen or completed a Form I-9.  Witness #4 stated that she/he had neither seen nor completed a Form I-9. I then showed Witness #4 a blank Form W-4. Witness #4 stated that she/he had completed this document on hiring day at the PSBC and that CARMONA was present.

41.     On March 18, 2008, SA Manuel Dorado and I interviewed Witness #4. I showed Witness #4 a photographic lineup display folder marked, "I" containing six photographs numbered one through six. Witness #4 identified the photograph in position number "3" as NELSON. Witness #4 stated that NELSON is a manager with the PSBC.

42.     I then showed Witness #4 a photographic lineup display folder marked, "K" containing six photographs numbered one through six. Witness #4 identified the photograph in position number "5" as RAMIREZ. Witness #4 stated that RAMIREZ is her/his immediate supervisor at the PSBC.

43.     I showed Witness #4 a photographic lineup display folder marked, "J" containing six photographs numbered one through six. Witness #4 identified the photograph in position number "4" as HERNANDEZ. Witness #4 stated that HERNANDEZ is a supervisor at the PSBC.

44.     On March 25, 2008, Witness #4 provided me with a PSBC application for employment.

45.     On April 30, 2008, at approximately 9:50 a.m., an ICE confidential informant ("CI") entered the PSBC. SA Manuel Dorado, Stephen Marin, and I were the controlling agents and were located in the vicinity of the PSBC. At the PSBC, the CI was interviewed. The CI departed the PSBC at approximately 10:12 a.m.

46.     On April 30, 2008, SA Dorado, SA Marin, and I debriefed the CI concerning the interview at the PSBC. The CI stated that there had been six to eight other people waiting for an interview. The CI stated that CARMONA was interviewing four people simultaneously. The CI stated that she/he was brought into the office with four other people and that CARMONA asked the interviewees for their PSBC application, resident alien card, and social security card. CARMONA spoke to them in the Spanish language. CARMONA made copies of their documents and then returned the documents. CARMONA asked the interviewees if they spoke English. The interviewees responded, in Spanish, "Very little." The CI stated that CARMONA said, "It's alright, I knew very little English when I first entered this country." During the interview, CARMONA told the interviewees that he is creating a new shift; however, they are not going to be paid by the PSBC, but through his personal account or a new business. CARMONA told the interviewees that they would be employed at the PSBC.

-14-

47.     On May 19, 2008, SA Manuel Dorado and I met with Witness #4 and showed her/him a photographic lineup display folder marked, "L" containing six photographs numbered one through six. Witness #4 identified the photograph in position number "5" as CARMONA, the person who hired her/him at the PSBC. Witness #4 stated that CARMONA is a supervisor. Witness #4 stated that CARMONA is the current manager of "Just Off Melrose, Inc" (JOM, Inc.). Witness #4 stated that CARMONA is known as "Eduardo." The photograph in position 5 of lineup L is in fact CARMONA.

48.     On May 20, 2008, SA Manuel Dorado and I interviewed Witness #4 . Witness #4 stated that on May 14, 2008, CARMONA held a meeting with PSBC and JOM, Inc. employees regarding employee interaction. Witness #4 stated that CARMONA told the PSBC employees not to interact with JOM, Inc. employees and not to use their supplies or equipment. Witness #4 stated that CARMONA warned the employees if they are caught violating these rules they will be replaced. Witness #4 further stated JOM, Inc. timecards are located next to the time clock at the back entrance of the premises.

49.     On June 17, 2008, SA Manuel Dorado and I met with Witness #3 and showed her/him a photographic lineup display folder marked, "L" containing six photographs numbered one through six. Witness #3 identified the photograph in position number "5" as CARMONA. Witness #3 stated that CARMONA was a supervisor with the PSBC.

50.     On June 17, 2008, SA Manuel Dorado and I met with Witness #2 and showed her/him a photographic lineup display folder marked, "L" containing six photographs numbered one through six. Witness #2 identified the photograph in position number "5" as CARMONA. Witness #2 stated that CARMONA was a supervisor for the PSBC.

-15-

51.   On July 14, 2008, SA Stephen Marin and I interviewed Witness #4.

   a.   Witness #4 stated that she/he remembered an incident which occurred at the PSBC. Witness #4 stated that the long-term employees had questioned HERNANDEZ as to why they weren't off on holidays. Witness #4 stated that HERNANDEZ replied, "Remember what Willie told you: There are no holidays because if you get arrested by the police or Immigration, he promised to get your job back."

   b.   Witness #4 stated that HERNANDEZ had asked her/him if she/he had seen a certain former employee. Witness #4 told HERNANDEZ that she/he had not, and HERNANDEZ told Witness #4 to tell that certain former employee that NELSON will rehire that former employee like he promised all the employees if they were arrested by INS. Witness #4 further stated that the working conditions at the PSBC are bad and very hot; there are no fans or air conditioning in the work areas. Witness #4 stated that on one occasion several workers went outside to drink water. Witness #4 witnessed CARMONA yell at the workers who were drinking water and ordered them to go home. CARMONA then turned and told the other workers that if they complained, they could also go home. Witness #4 stated that it is so hot that she has observed puddles of water where the employees are standing, and that she/he goes regularly to the bathroom to squeeze the water out of her/his pants. Witness #4 stated that the workers are afraid to complain because they fear losing their jobs.

-16-

52. On July 25, 2008, SA's Mike Naranjo, Stephen Marin, Manuel Dorado, and I interviewed Witness #2. Witness #2 stated that in 2003, CARMONA held a meeting with approximately 30 PSBC employees, including Witness #4, regarding an employee's on-job-injury. Witness #2 stated that CARMONA appeared upset and said, "A lot of you F--king Mexican workers have no documents, come here with no papers, and try to give me lawsuits." Witness #2 stated that CARMONA said, "You all work here trying to take money away from citizens like Supervisor Margarita Hernandez and Supervisor Alicia Ramirez."

53. On August 4, 2008, Special Agents Michael Naranjo and I interviewed Witness #4 concerning her employment with the PSBC. SA Stephen Marin translated in the Spanish language, concerning her employment with the PSBC. During the interview:

      a.     Witness #4 stated that that her/his ex-spouse's cousin, is a former PSBC employee; that that individual spoke to PSBC supervisor CARMONA in October of 2002 about Witness #4 working for the PSBC; and that the relative provided Witness #4 with a blank application.

      b.     Witness #4 stated that on November 1, 2002, she/he met with CARMONA at the PSBC. CARMONA took her/him into his office. CARMONA provided Witness #4 with a blank application and told her/him (Witness #4): "You should have filled this out but don't worry I'll fill it out for you." Witness #4 stated that CARMONA spoke to her/him in the Spanish language. CARMONA proceeded to fill out Witness #4's application, and then CARMONA turned to her/him and said, "You are very eager to work but you need to work very hard if I hire you, okay." CARMONA asked

-17-

Witness #4 to come the next day dressed in white clothes and to bring her/his identification and social security card.

c.   Wintess #4 stated that on November 2, 2002, she/he showed up at the PSBC. There were eight other people present at the PSBC who were applying for employment at the same time. CARMONA brought each individuals into his office separately.  CARMONA brought Witness #4 into his office, copied her/his social security card and U.S. Resident Alien Card, and then returned the cards to her/him.  Witness #4 stated that CARMONA wrote Witness #4's social security number, identification number, and other information on her/his application.

d.   Witness #4 stated that in November of 2003, she/he arrived late for work and that CARMONA brought Witness #4 into an office manager's office and asked her, "Why are you late?" Witness #4 replied, "I took the bus." CARMONA asked her/him: "Do you have the money to buy a car." Witness #4 replied that she had no money.  CARMONA asked Witness #4, "Haven't you paid your smuggling fees off yet?"  She told CARMONA, "I haven't paid the smuggling fees because I was trying to bring my child from Mexico to the U.S."  Witness #4 stated that CARMONA knew she/he was an illegal alien because CARMONA had asked if she/he had paid off her/his smuggling fees.

e.   Witness #4 stated that in May of 2003, she/he was assisting another individual in making bread on the production line near the French bread

-18-

machine. CARMONA approached her/him and the other individual, and then CARMONA engaged in a conversation with the other individual. Witness #4 stated that she/he went to the bathroom, and upon returning from the bathroom overheard CARMONA ask the other individual: "What part of Mexico did you come from?" That person replied that she/he was from Apan, Mexico. CARMONA then asked Witness #4, "What part of Mexico are you from?" She/he replied Apan, Mexico.

f.    Witness #4 stated that in August of 2005, while working at the bread table, she/he asked PSBC supervisor HERNANDEZ, "Does everyone who works here have papers?" HERNANDEZ replied, "If INS came here they will just put all of you against the wall and arrest all of you." Witness #4 stated that HERNANDEZ knew she/he was an illegal alien because HERNANDEZ had told her/him what INS would do if they were all arrested.

g.    Witness #4 stated that on March 17, 2002, she/he went into the break room and asked PSBC supervisor HERNANDEZ if she/he could have March 18, 2002, off from work. HERNANDEZ replied: "You wetbacks are always trying to get off and take advantage of the welfare system; if you keep this up, I am going to notify Immigration myself."

h.    Witness #4 stated that on May 1, 2006, PSBC manager NELSON called a meeting for all employees and informed the employees that the meeting was being held in response to civil protest marches regarding the rights of

-19-

illegal aliens. Witness #4 stated that an employee asked NELSON, "What happens if INS comes and takes us away." NELSON told the employees, "If you're arrested, you can get your job back". That every holiday the employees ask their supervisors why are they not off on holidays? PSBC Supervisors Jorge Lopez and Enrique Aguirre told the employees if they miss any holidays NELSON will fire them.

i.  Witness #4 stated that CARMONA gathers the employees together the day before state inspections and threatens the employees that if they fail an inspection or lose an account, management will fire employees. She/he also stated that HERNANDEZ and RAMIREZ told the employees to take lunch when the inspectors come to the business.

j.  Witness #4 stated on March of 2007, RAMIREZ asked her/him if she/he had paid a smuggler. Witness #4 stated that she/he told RAMIREZ that she/he had paid a smuggler $1,500. Then RAMIREZ asked Witness #4, "Do you have papers." Witness #4 told RAMIREZ that she/he did not have any papers. RAMIREZ then told Witness #4: "You should marry a U.S. citizen, so [she/he] can fix your papers." Then RAMIREZ asked the other employees at the bread table if they had papers. Witness #4 stated that RAMIREZ knew she/he was an illegal alien because RAMIREZ had asked her/him if she/he had paid off the smuggler and had asked if she/he had any papers. Witness #4 further stated RAMIREZ knew she/he was illegal because RAMIREZ told her/him to marry a United States citizen so

-20-

that she/he could fix her/his papers.

    k.      Witness #4 stated that in May of 2004, HERNANDEZ and some other employees were working at the bread table when HERNANDEZ asked her/him (Witness #4) how she/he entered the United States. Witness #4 told HERNANDEZ that she/he paid a smuggler $1,500 and entered the United States illegally. Witness #4 told HERNANDEZ that she/he might go back to Mexico because the work here is so hard and hot. Then HERNANDEZ told Montano, "Maybe you should go back to Mexico, but maybe you may not be able to come back to the U.S. because you have to pay a smuggler."

54.    On August 4, 2008, SA's Michael Naranjo and I interviewed Witness #3. SA Stephen Marin translated in the Spanish language, concerning her/his employment with the PSBC. During the interview, Witness #3 stated the following:

    a.      Witness #3 stated that she worked at the Howard Johnson's Hotel in Palm Springs, California with a co-worker named Angel. Angel told her/him to apply at the PSBC where Angel worked on Fridays and Saturdays.

    b.      Approximately two weeks later, Witness #3 went to the PSBC and obtained an application. She/he filled out the application and returned it to PSBC supervisor HERNANDEZ. HERNANDEZ told her/him to come back dressed in white clothes, with her/his U.S Resident Alien Card, and social security card. HERNANDEZ told Witness #3 that the only shift available was from 2:00 a.m. to 10:00 a.m. HERNANDEZ told Witness

#3 to come back the next day so that Witness #3 could speak with Supervisor CARMONA.

c.   Witness #3 returned to PSBC on the following day at 8:00am and met with CARMONA who introduced ROJAS to Supervisor RAMIREZ and Supervisor NELSON.

d.   Witness #3 stated that RAMIREZ showed her/him the facility grounds, and then Witness #3 worked/trained for approximately four hours.

e.   On January 1, 2006, she/he (Witness #3 ), RAMIREZ, and six other employees were at the bread table packaging bread when RAMIREZ asked Witness #3, "How much did you pay the smuggler?" Witness #3 told RAMIREZ that she/he (Witness #3) paid the smuggler $3,000 and that she/he (Witness #3) had no documents. RAMIREZ told Witness #3, "You should marry a USC so [she/he] can fix your papers." Witness #3 said, "Yeah," and then RAMIREZ turned to the other workers at the table and spoke with them concerning the same subject.

55.   On August 4, 2008, SA's Michael Naranjo and I interviewed Witness #2. SA Stephen Marin translated in the Spanish language, concerning her employment with PSBC. During the interview, Witness #2 stated the following:

a.   Witness #2 stated that she/he and a sibling were shopping one day in September of 2000, when she/he (Witness #2) overheard women speaking in the Spanish language concerning a bakery that was hiring people on Montalvo Way in Palm Springs. At the PSBC, Witness #2 and her/his

-22-

sibling asked office manager Judy Loncar for an application. On October 23, 2000, Witness #2 and her/his sibling submitted applications for employment to supervisor CARMONA. On October 26, 2000, Witness #2 stated that CARMONA called her/him and her/his sibling concerning employment at the PSBC. CARMONA told Witness #2 to arrive for work dressed in white clothes. CARMONA told Salvador-Ramirez to bring her/his social security card and U.S. Resident Alien Card.

b.    Witness #2 stated that on October 27, 2000, she/he arrived at the PSBC and met with CARMONA. CARMONA reviewed her/his application and then made copies of her/his social security card and U.S. Resident Alien Card. CARMONA trained Witness #2 for approximately four hours at the PSBC. Afterwards, CARMONA introduced Witness #2 to manager NELSON.

c.    Witness #2 stated that in January 2001, she/he, HERNANDEZ, and some other PSBC employees, were packaging bread when HERNANDEZ asked Witness #2 what part of Mexico she/he (Witness #2 ) was from. Witness #2 told HERNANDEZ that she/he was from Apan, Mexico. HERNANDEZ then asked her/him how much money she/he paid the smuggler. Witness #2 told HERNANDEZ that she/he had paid $1,500 and explained to HERNANDEZ that she/he left Mexico because her/his house had been placed in foreclosure. HERNANDEZ had suggested that Witness #2 should marry a United States citizen in order to obtain papers.

-23-

After the conversation, HERNANDEZ spoke with the other employees at the table concerning the same subject.

d.      Witness #2 stated that in November 2002, she, RAMIREZ, and some other PSBC employees were packaging bread. RAMIREZ asked Witness #2 if she/he had any legal papers. Witness #2 told RAMIREZ that she/he did not have papers and that she/he was illegal. RAMIREZ told Witness #2 not to be dumb and marry a United States citizen. RAMIREZ asked Witness #2 how much did you pay for a smuggler. Witness #2 told RAMIREZ she/he had paid $1,500. After the conversation, RAMIREZ spoke with the other employees at the table concerning the same subject.

e.      Witness #2 stated that in October 2003, CARMONA held a meeting with approximately 30 employees concerning an employee's on-the-job injury. Witness #2 stated that CARMONA appeared upset and spoke in expletive terms concerning Mexican nationals with no documents trying to sue the PSBC and take away money from citizens like HERNANDEZ and RAMIREZ.

56.     On August 6, 2008, SA Manuel Dorado and Stephen Marin met with the CI and showed the CI a photographic lineup display folder marked, "L" containing six photographs numbered one through six. The CI identified the photograph in position number "5" as CARMONA. The CI stated CARMONA interviewed him/her for employment at the PSBC. The CI stated that she/he never heard back from CARMONA or from PSBC about a job.

## THE EXECUTION OF THE SEARCH WARRANT

57.     On September 10, 2008, I and other ICE agents executed a search warrant at the

-24-

PSBC. Seized during the execution of the search warrant were some 20 boxes of documents that included employee records and payroll records.

58.     During the execution of the search warrant, we also located 52 persons at the PSBC worksite who we administratively determined were aliens unlawfully in the United States and subject to deportation. Of these, we administratively detained 15 persons, who are now subject to immigration removal proceedings; the remaining individuals were released on humanitarian grounds, although they remain subject to immigration removal proceedings.

59.     HERNANDEZ was located at the PSBC worksite and arrested on September 10, 2008. After HERNANDEZ was advised of and waived her <u>Miranda</u> rights, I interviewed her. She admitted to knowing that NELSON was hiring undocumented workers, and that she knew from her conversations with workers that they were undocumented.

60.     RAMIREZ was located but not arrested, and is due to appear in court on a later date.

61.     I reviewed reports stating that Mariano Benitez-Gutierrez, Julio Crespin-Perez, and Melvin Rodriguez-Segura were arrested during the execution of the search warrant on September 10, 2008. I also learned from reviewing reports that these individuals were let go on their own recognizance pending their immigration removal proceedings.

## STATEMENTS OF THE PROPOSED MATERIAL WITNESSES

62.     On or about October 1, 2008, I reviewed the ICE Alien File for Mariano Beintez-Gutierrez ("Gutierrez") and learned the following:

      a.     Gutierrez is a citizen of Mexico

      b.     Gutierrez entered the United States illegally in or about November of

-25-

2000.

63.     At the ICE office on October 1, 2008, in my presence, ICE SA Angel Carvajal advised Gutierrez of his <u>Miranda</u> rights in the Spanish language.  Gutierrez stated he understood his rights, and signed a form agreeing to waive his rights.  SA Michael Naranjo and I then interviewed Gutierrez, with SA Carvajal interpreting in Spanish.  Gutierrez stated the following:

      a.     Gutierrez is employed at PSBC, where he is a supervisor.  He reports to HERNANDEZ and NELSON.

64.     At the ICE office on October 8, 2008, I interviewed Gutierrez again with ICE SA Michael Naranjo.  Gutierrez was present with his attorney Karan Kler.  The interview was conducted in Spanish.  Gutierrez stated the following:

      a.     Gutierrez was hired to work at PSBC in December of 2002.  Gutierrez stated he returned to Mexico around December 15, 2002 because he had to deliver money to his family.  However, before Gutierrez left he told Eduardo [CARMONA] about his situation and Eduardo told him that once he return from Mexico he can work for PSBC.

      b.     Gutierrez states, approximately six years ago at PSBC, Willie [whom I believe to be NELSON] and Margarita [whom I believe to be HERNANDEZ] approached him, while he was making bread, and asked him about his immigration status.  Gutierrez says that he told Willie he was illegal.  Margarita was present and interpreted for Willie.  Gutierrez states that Willie did not do anything.  According to Gutierrez., Willie did not tell him about his illegal status again.  At the time, Gutierrez believed

-26-

that PSBC did not care about his illegal status.

c.   Gutierrez stated, in February 2004, with the help of an alien smuggler he

reentered the U.S. illegally near Calexico, CA.  Gutierrez further states he

paid the alien smuggler $1,500.

d.   Gutierrez stated that in February 2004 he return to PSBC and Willie

[whom this writer believes to be NELSON] rehired him.  Gutierrez stated

he had no doubt PSBC would rehire him again because he believes

everyone at PSBC is illegal and have fraudulent documents.

e.   Gutierrez stated Eduardo [whom this writer believes to be CARMONA]

approached him, approximately six months (August 2004), at PSBC and

asked me if I had any papers.  Gutierrez told Eduardo "he did not."

Eduardo responded "o.k." turn and walked away.  Gutierrez states he

remembered this incident occurred near the bread furnace.  Gutierrez

mention that Eduardo never approached him about this matter again.

f.   Gutierrez overheard Margarita [whom this writer believes to be

HERNANDEZ] supervises approximately twenty PSBC employees.

Gutierrez stated these employees are illegal through conversations with

them.

g.   Gutierrez overheard Margarita openly ask her employees if they had any

papers.

h.   Gutierrez mentions that he was a supervisor when he told Willie he was

illegal in the U.S.

-27-

     i.     Gutierrez overheard all the PSBC employees talk at work about their illegal status in the U.S.

     j.     On the bakery floor, Gutierrez stated he overheard all PSBC employees and supervisors questioned new employees about their immigration status.

65.     Following the interview, I showed Gutierrez photographic lineups that included photographs of NELSON, HERNANDEZ, and CARMONA. Gutierrez correctly identified each of these individuals from the lineups.

66.     At the ICE office on October 8, 2008, I interviewed Julio Crespin-Perez ("Perez") with ICE SA Michael Naranjo. Perez's attorney Karan Kler was present. The interview was conducted in Spanish. Perez received his <u>Miranda</u> rights, which Crespin waived on advice of attorney Karan Kler. Perez stated the following:

     a.     Perez was born on October 1, 1988 in La Paz, El Salvador. He states he has no documents to enter, remain, or work in the U.S.

     b.     Perez stated he entered the United States illegally, in December 2007, near San Ysidro, California with a help of an alien smuggler. He paid the smuggler $8,000.

     c.     Perez stated he began working for Just Off Melrose, Inc. ("JOM") in May 2008.

     d.     Perez stated a person recommended him to work at PSBC.

     e.     Perez stated this person told him JOM hires people without papers. The person told Perez another person gave him this information.

     f.     Perez stated he went to JOM to speak with a Brandon [whom this writer

-28-

believes to be a CEO of PSBC Brandon TESMER] who introduced him to Eduardo [whom this writer believes to be CARMONA].

g.   Perez stated he completed a JOM application with help from his cousin.

h.   Perez states he return to JOM and gave his application to Eduardo. Eduardo told him "do you have documents." Perez told him "he does not.: Eduardo told him to get fake documents and return to him. Perez bought fake documents and return to JOM and met with Eduardo. Perez states Eduardo assisted him with the application process.

i.   Perez states he told Eduardo about hiring him. Eduardo told him to wait while he speaks with Brandon. Eduardo returned and told Perez "it was o.k. to work because Brandon approved it."

j.   Eduardo is Perez supervisor.

k.   Perez stated everyone working for JOM is illegal.

67.   Following the interview, I showed Perez photographic lineups that included photographs of CARMONA and TESMER. Previously, I reviewed a DMV photograph of TESMER. From my knowledge of the DMV photographs of CARMONA and TESMER, I know that Perez correctly identified each of these individuals from the lineups.

68.   At the ICE office on October 8, 2008, I interviewed Melvin Rodriguez-Segura ("Segura"). The interview was conducted in Spanish. Segura was present with attorney Karan Kler. Segura was provided his Miranda rights which he waived at the advice of Karan Kler. Segura stated the following:

a.   Segura stated he paid a smuggler $5,000 to be smuggled from Guatemala

-29-

to the United States.

b.  Segura stated his cousin Bertha Reyes, a former PSBC employee, referred him for work at the PSBC. He said his cousin told him the PSBC does not require any papers.

c.  Segura stated he began working for PSBC in October 2003.

d.  Segura stated Eduardo Carmona hired him to work at PSBC.

e.  Segura stated he presented to Eduardo a fraudulent social security immigration card.

f.  Segura stated he knows Eduardo know he is illegal because his documents are very bad.

g.  Segura stated his supervisor is Willie Nelson.

h.  Segura stated that Willie Nelson promoted him to supervisor.

i.  Segura stated he refered his wife, B.S., to Willie Nelson. He said Willie hired her even though she had fraudulent documents.

j.  Segura stated he had a conversation with Margarita about the immigration arrests of PSBC employees. Segura mentions that Margarita and he were concerned because immigration had information about the illegals at the company. Segura told Margarita that he was afraid that immigration was going to come to the company and arrest him and all the illegals. Segura told Margarita he was illegal and told her "what are going to do about it." Margarita responded by telling him that she was legal and could not do anything.

-30-

k.   Segura stated he came to work the next day around 9:00 a.m. and found no workers at the PSBC. Segura went to Wille and asked him what happened. Willie told Segura that immigration had picked up some of our illegal workers. Willie told Segura you got to work with what you have because the illegal worker may not come in.

69.   Following the interview, I showed Segura photographic lineups that included photographs of CARMONA, HERNANDEZ, and NELSON. Segura correctly identified each of these individuals from the lineups.

-31-

## CONCLUSION

65.     Based on the foregoing, I believe that the submit that there is probable cause to

believe that the testimony of Mariano Benitez-Gutierrez, Julio Crespin-Perez, and Melvin

Rodriguez-Segura are material to this investigation of the Palm Springs Baking Company and

Just Off Melrose, Inc., where there are possible violations of Title 8, United States Code, Section

1324, Harboring Illegal Aliens.  I further believe that, given these individuals status as aliens who

have entered and remained in the United States illegally, it may become impractical to secure the

presence of Mariano Benitez-Gutierrez, Julio Crespin-Perez, and Melvin Rodriguez-Segura by

subpoena absent the Court detaining him or imposing conditions for his release.


Larry Chacon
Special Agent
U.S. Department of Homeland Security
Immigration and Customs Enforcement


Sworn and subscribed to before me
This _____ day of October 2008.



_____
THE HONORABLE OSWALD PARADA
UNITED STATES MAGISTRATE JUDGE